1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**
10                    **EASTERN DIVISION**
11  **JOSEPH PRESTON,**                    )
                                           )
12              **Plaintiff,**             )    **Case  No. EDCV 11-01914  AJW**
                                           )
13              **v.**                     )    **MEMORANDUM OF DECISION**
                                           )
14  **MICHAEL J. ASTRUE,**                 )
    **Commissioner of the Social**         )
15  **Security Administration,**           )
                                           )
16              **Defendant.**             )
    _____    )
17
18          Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the

19  Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance

20  benefits and supplemental security income ("SSI") benefits.  The parties have filed a Joint Stipulation ("JS")

    setting forth their contentions with respect to each disputed issue.
21
22                              **Administrative Proceedings**

23          The  procedural  facts  are  undisputed  and  are  summarized  in  the  Joint  Stipulation. [JS 2; <u>see</u>

24  [Administrative Record ("AR") 236-237]. Following a decision by this court reversing the Commissioner's

25  denial of benefits and remanding this case for further development of the record, an administrative law judge

26  ("ALJ") issued a final written hearing decision dated September 22, 2011.  The ALJ found that plaintiff did

27  not have a severe impairment or combination of impairments beginning on April 1, 2008, and therefore that

28

1    plaintiff's disability ended on that date.[1] [AR 239-245].

2                                  **Standard of Review**

3            The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial

4    evidence or is based on legal error. Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir.

5    2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than

6    a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir.

7    2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

8    Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)(internal quotation marks omitted). The court is

9    required to review the record as a whole and to consider evidence detracting from the decision as well as

10   evidence supporting the decision.  Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006);

11   Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than

12   one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

13   Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.

14   1999)).

15                                     **Discussion**

16       **Severity determination**

17           Plaintiff contends that the ALJ erred in finding that plaintiff's mental impairment is not severe.

18           At step two of the sequential evaluation procedure, a claimant has the burden to present evidence of

19   medical signs, symptoms and laboratory findings that establish a medically determinable physical or mental

20   impairment that is severe, and that can be expected to result in death or which has lasted or can be expected

21   to last for a continuous period of at least twelve months. Ukolov v. Barnhart, 420 F.3d 1002, 1004–1005 (9th

22   Cir. 2005); Smolen v. Chater, 80 F.3d 1273, 1289-1290 (9th Cir. 1996). A medically determinable mental

23   impairment is one that results "from anatomical, physiological, or psychological abnormalities which can

24

25       [1]    Plaintiff previously was found disabled under the childhood disability standard for attention
     deficit hyperactivity disorder and oppositional defiant disorder, but those benefits were terminated
26   once plaintiff turned 18.  Plaintiff filed new applications for disabled adult child benefits and for
     adult SSI benefits.  His application for adult SSI benefits was granted, but on remand, the ALJ
27   reopened that application and denied it, along with plaintiff's application for disabled adult child
     benefits.  The denial of plaintiff's applications for disabled adult child benefits and adult SSI benefits
28   are at issue in this action. [See JS 2; AR 236-237].

                                            2

1    be shown by medically acceptable clinical and laboratory diagnostic techniques," and it "must be established

2    by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's]

3    statement of symptoms."   20 C.F.R. §§ 404.1508, 416.908; see 20 C.F.R. §§ 404.1520a(b)(1),

4    416.920a(b)(1).  Symptoms are the claimant's description of his or her impairment, while psychiatric signs

5    are medically demonstrable and observable phenomena which indicate specific abnormalities of behavior,

6    affect, thought, memory, orientation, and contact with reality. See 20 C.F.R. §§ 404.1520a(b), 404.1528(b),

7    416.920a(b), 416.928(b); see also Social Security Ruling ("SSR") 96-4p, 1996 WL 374187, at *1-*2.

8         If a claimant demonstrates the existence of a medically-determinable impairment, the ALJ must

9    determine whether the impairment significantly limits the claimant's ability to perform "basic work

10   activities." 20 C.F.R. §§ 404.1521 (a), 416.921(a); see Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005).

11   Basic work activities are the "abilities and aptitudes necessary to do most jobs," such as (1) physical

12   functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling; (2) the

13   capacity for seeing, hearing, speaking, understanding, carrying out, and remembering simple instructions;

14   (3) the use of judgment; and (4) the ability to respond appropriately to supervision, co-workers, and usual

15   work situations.  20 C.F.R. §§ 404.1521(b), 416.921(b).

16        The ALJ must consider the claimant's subjective symptoms in making a severity determination if

17   the claimant "first establishes by objective medical evidence (i.e., signs and laboratory findings) that he or

18   she has a medically determinable physical or mental impairment(s) and that the impairment(s) could

19   reasonably be expected to produce the alleged symptom(s)."  SSR 96-3p, 1996 WL 374181, at *2.  If the

20   claimant produces such evidence, "and there is no evidence of malingering, the ALJ can reject the claimant's

21   testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for

22   doing so."  Smolen, 80 F.3d at 1281.

23        The ALJ found that plaintiff had a medically determinable combination of impairments, and that

24   those impairments could reasonably be expected to cause plaintiff's alleged symptoms.  Therefore, the ALJ

25   was obliged to consider plaintiff's subjective symptoms as well as objective medical evidence (that is, "signs

26   and laboratory findings") in making his severity determination.  The ALJ found that plaintiff's subjective

27   symptoms were not credible, and that the objective medical evidence did not demonstrate the existence of

28   an impairment that more than minimally limited his ability to work during any consecutive 12-month period.

[AR 239, 240, 244].

**Selective muteness**

The ALJ noted that plaintiff refused to testify or answer questions (save one) during the August 17, 2011 hearing on remand.[2]  However, the ALJ and the hearing monitor observed plaintiff speaking outside the hearing room, either to his father or to a third person.  In addition, plaintiff had testified "extensively" during the October 2009 hearing, exhibited no problems communicating, and responded appropriately to questioning.  [See AR 242, 392, 401-402].

The ALJ pointed out that "selective muteness" also had been documented in some of plaintiff's medical records.  [See AR 241-243].  For example, during a March 2010 consultative examination with Carol Fetterman, Ph.D., plaintiff "did not speak at all," making it impossible for Dr. Fetterman to interview him or conduct a mental status examination.  [AR 304-305].  Plaintiff's father provided a history. He told Dr. Fetterman that plaintiff had been psychiatrically hospitalized four times, most recently in 2008. [AR 301].  Based on plaintiff's father's report and a February 2010 treatment note (which was also based on plaintiff's father's report of plaintiff's symptoms), Dr. Fetterman gave plaintiff a diagnosis of schizoaffective disorder with depression "by history."  She opined that plaintiff was severely impaired, with a Global Assessment of Function ("GAF") score of 21.[3] [AR 241, 243, 300-305]. In contrast, plaintiff provided an

---

[2]    The hearing transcript indicates that plaintiff answered the ALJ's first question by responding "Yes I am" when asked whether he was represented by attorney Dan Keenan, who was present during the hearing. [AR 392].  The hearing transcript states that plaintiff's responses to the ALJ's next two questions were "inaudible," including his response to the question "Are you going to sit here and not talk through this at all, Mr. Preston?" [AR 392].  Hearing no answer, the ALJ instructed plaintiff to go sit in the back of the room.  Plaintiff's counsel did not object.  Neither the ALJ nor plaintiff's counsel asked plaintiff any additional questions. The ALJ warned plaintiff on the record that he would use plaintiff's refusal to speak as a ground for denying benefits.  [See AR 392-402].

[3]    The GAF score is a "multiaxial" assessment that reflects a clinician's subjective judgment of a patient's overall level of functioning by asking the clinician to rate two components: the severity of a patient's psychological *symptoms,* or the patient's psychological, social, and occupational *functioning*.  A GAF score of 21 through 30 means that delusions or hallucinations considerably influence the individual's behavior, a serious impairment in communication or judgment exists (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or the individual is unable to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") Multiaxial Assessment, 27-36 (rev. 2000)).

oral history and answered questions during a March 2008 consultative psychiatric examination with Dr. Linda Smith. [See AR 243, 197-203]. She opined that plaintiff had a "very mild" mood disorder, not otherwise specified, was not functionally impaired, and assigned a GAF score of 68, denoting mild symptoms. See note 3, supra.

Plaintiff's treating psychiatrist, Dr. Jesse Devera of San Bernardino County Department Behavioral Health ("County Behavioral Health"), wrote that plaintiff was "selectively mute" in progress notes dated December 2009 and February 2010. [AR 282, 284]. However, other treatment records indicate that plaintiff spoke with his doctors and answered their questions. [See, e.g., AR 358-364].

Reasoning that plaintiff had not been diagnosed with any communication disorder and was able to speak when he wanted to do so, the ALJ permissibly concluded that plaintiff's "selective muteness" amounted to a failure to cooperate that seriously undermined the credibility of plaintiff's subjective symptoms. See Thomas, 278 F.3d at 959 (holding that the claimant's failure to cooperate during examinations and "self-limiting" behaviors were "compelling" reasons supporting the ALJ's finding that her subjective complaints were not credible); Tonapetyan v. Halter, 242 F.3d 1144, 1147 (9th Cir. 2001) (holding that the ALJ permissibly discredited the plaintiff's testimony based on her "lack of cooperation" and "poor effort" during consultative examinations); Walker v. Astrue, 2011 WL 590599, at *4, 10 (E.D. Cal. Feb. 10, 2011) (holding that the claimant's selective muteness demonstrated a lack of cooperation that supported the ALJ's negative credibility determination); see also Widman v. Astrue, 302 Fed.Appx. 744, 747 (9th Cir. Dec. 9, 2008) (holding that the ALJ properly used "ordinary techniques of credibility evaluation" to reject subjective testimony where an examining physician observed the claimant "purposefully underperforming on a medical exam").

### Lay witness testimony - "Field Office interviewer"

Significantly, plaintiff does not challenge the ALJ's credibility findings with respect to plaintiff or his father. Plaintiff contends, however, that the ALJ did not properly consider observations of plaintiff by a Social Security Administration ("SSA") "Field Office interviewer." [JS 21-23 (citiing AR 318-320)].

Plaintiff's argument is baseless. The cited report was not prepared by a field office interviewer and does not report firsthand observations of plaintiff by any SSA employee. It is a "Case Analysis" prepared

1   by the state disability agency that summarizes evidence in the case file and asks Dr. Amado for

2   recommendations. [AR 318-320].  The ALJ properly evaluated Dr. Amado's opinion.  He was not required

3   to consider the summary of evidence in the Case Analysis.

4                    **Examining and nonexamining source opinions**

5           Plaintiff contends that in making his severity finding, the ALJ improperly rejected Dr. Fetterman's

6   March 2010 consultative psychiatric evaluation and the April 2010 opinion of Dr. Amado, a nonexamining

7   state agency physician.

8           If a treating source opinion is uncontroverted, the ALJ must provide clear and convincing reasons,

9   supported by substantial evidence in the record, for rejecting it.  If contradicted by that of another doctor,

10  a treating or examining source opinion may be rejected for specific and legitimate reasons that are based on

11  substantial evidence in the record. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007);  Tonapetyan, 242 F.3d

12  at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). The opinion of a non-examining

13  physician normally is entitled to less deference than that of an examining and treating physician because he

14  or she does not have the opportunity to conduct an independent examination and does not have a treatment

15  relationship with the claimant.  See Andrews v. Shalala, 53 F.3d 1035, 1040-1041 (9th Cir. 1995). "[T]he

16  contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason

17  for rejecting a treating or examining physician's opinion, [but] it may constitute substantial evidence when

18  it is consistent with other independent evidence in the record." Tonapetyan, 242 F.3d at 1148.

19          Both Dr. Fetterman and Dr. Smith are examining doctors, so their opinions cannot be distinguished

20  on that basis.   As noted above, plaintiff did not speak to Dr. Fetterman, so she was unable to obtain the

21  clinical data that such an examination would ordinarily provide.   Instead, Dr. Fetterman relied on a

22  description of plaintiff's history and symptoms provided by his father, whose observations are not sufficient

23  to establish the existence of a severe impairment.  See 20 C.F.R. §§ 404.1528(a)&(b), 416.928(a)&(b)

24  ("Symptoms are your own description of your physical or mental impairment. Your statements alone are not

25  enough to establish that there is a physical or mental impairment. . . .  Signs are anatomical, physiological,

26  or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must

27  be shown by medically acceptable clinical diagnostic techniques.").

28

Dr. Smith, on the other hand, was able to conduct a complete psychiatric evaluation, including an interview and a mental status examination, and she cogently explained how her examination findings supported her conclusions. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.").  The ALJ was entitled to reject Dr. Fetterman's opinion in favor of that of Dr. Smith.

Similarly, both Dr. Amado, whose opinion the ALJ rejected, and Dr. Kania, whose testimony the ALJ accepted, are nonexamining physicians. [See AR 240, 243, 306-317, 393-400].  Both provided an explanation for their conclusions, but Dr. Amado's opinion was based in part on Dr. Fetterman's opinion, which the ALJ permissibly rejected. Dr. Kania also had the opportunity to consider plaintiff's treatment history after April 2010, the date of Dr. Amado's opinion.  Dr. Kania testified that "[e]ven with the most recent records, there is no evidence the plaintiff has a psychotic disorder, which will last for or has lasted for 12 months' duration." [AR 240, 397].   Accordingly, the ALJ did not err in rejecting Dr. Amado's opinion.

The ALJ's resolution of the conflicts between the examining and nonexamining source opinions was proper. See generally Andrews, 53 F.3d at 1039 ("The ALJ is responsible for determining credibility, resolving conflicts in the medical testimony, and for resolving ambiguities.").

**Treating source reports**

Plaintiff contends that the ALJ did not properly consider the treating physicians' findings from September 2009 through March 2010 and June 27, 2011.

The ALJ noted that during the relevant period (after April 1, 2008), the earliest date that plaintiff sought mental health treatment was September 2009, when he presented to County Behavioral Health.[4] [AR 241]. On intake, plaintiff was noted to be a poor historian and gave a vague history of his symptoms. Much of the reporting came from plaintiff's father, who said that his son stayed in his bedroom for days, did not

---

[4]    This matter was remanded to the Commissioner for further development of the record, particularly with respect to treating source evidence.  Plaintiff, who was represented by counsel during the hearing on remand, does not contend that the record is not fully and fairly developed.

like to be around people, had poor eating habits, low energy, low motivation, and a "dark" mood.  Plaintiff was using marijuana.  His father said that he was a paranoid schizophrenic Plaintiff was not receiving treatment and was not prescribed any medication.  During an initial medication visit with Dr. Han Nguyen, plaintiff said:  "My dad thinks I'm crazy, he wants me to take medication."  Dr. Nguyen diagnosed schizoffective disorder and cannabis abuse and prescribed medication.  [AR 241, 291-299].

Plaintiff returned for follow-up on October 20, 2009.  He reported that he was alright, denied hearing voices, was not paranoid, and said that he was taking his medications as prescribed.  He was noted to have blunted affect, poor insight, and subdued mood. [AR 241, 285].

On a follow-up visit on December 8, 2009, Dr. Devera observed that plaintiff was selectively mute. His father reported that plaintiff was not interacting with his family. He was alert and oriented with restricted affect. [AR 241, 284].

On January 22, 2010, Dr. Devera  signed a form provided by the San Bernardino County Transitional Assistance Department stating that plaintiff had been incapacitated from September 3, 2009 through that date.  Dr. Devera commented that plaintiff "cannot function under the stress of employment." [AR 282].

Plaintiff saw Dr. Devera again on February 1, 2010.  Plaintiff was noted to be isolative at home and selectively mute.  His father reported that he threw his video game device out the window for no reason. He was alert and oriented with restricted affect and poor insight. [AR 181].

During a visit on March 2, 2010, Dr. Marcia Hudson noted that plaintiff's father reported that plaintiff had not been taking his medication for about a month.  Plaintiff was cooperative and well-groomed. His mood was angry. [AR 388].

Two weeks later, plaintiff's father told Dr. Devera noted that plaintiff again was selectively mute. His father reported that plaintiff had left home for 10 days, and that he found plaintiff in a restaurant. Plaintiff started taking his medications when he returned home. Plaintiff was alert and oriented, with a restricted affect and angry mood.  He denied hallucinations and delusions. Dr. Devera noted that plaintiff was positive for auditory hallucinations, but the source of that information is unclear. [AR 387].  Plaintiff received a medication refill in June 2010, but there is no corresponding progress note. [AR 385].

///

The next treatment note is dated June 27, 2011, about 15 months after plaintiff's last treatment visit. Plaintiff's father or another family member called the police because plaintiff "was having a blank stare and threatening to kill his dad and then himself with his house keys. Dad informed that [plaintiff] has schizophrenic bipolar and [was] off his medication." [AR 334]. Plaintiff's father also reported that plaintiff had prior hospitalizations and "had problems with multiple substance use." [AR 332]. Police officers transported plaintiff to Arrowhead Regional Medical Center, where he was evaluated and admitted pursuant to California Welfare and Institutions Code section 5150 on the ground that he posed a danger to himself or others. [AR 322-343]. Asked on intake about the history of his present illness, plaintiff replied, "Ask my father. I don't know[,] this is bull . . . I heard that I tried to take the bat from my father." [AR 339]. Plaintiff's admitting diagnosis was schizoaffective disorder, bipolar type, rule out schizophrenia, paranoid type." [AR 334]. He was started on medication to control his agitation and hostile behavior. [AR 332, 334]. He was assigned an initial GAF score of 25, signifying a complete inability to function. [AR 334].

Plaintiff was discharged several days later, on July 2, 2011, with a diagnosis of schizoaffective disorder, bipolar type; a history of polysubstance abuse; and a GAF score of 50, which denotes serious symptoms or a serious impairment in functioning. [AR 334]. Plaintiff had initially refused medication but eventually complied, and his hospital course was "uneventful." [AR 334]. A doctor who treated plaintiff during his hospitalization met with plaintiff's father, who asserted that did not believe plaintiff's threat was credible and was not concerned for his own safety. Instead, he expressed concern that plaintiff could be shot by police if he acted in a threatening manner. [AR 334-335]. The physician wrote that plaintiff's father was "eager to take [plaintiff] home to take care of some financial problems, secondary to [plaintiff] getting conned by a money scheme on the internet and [to] prepare for SSI appeal." [AR 335]. Plaintiff's father reported a long, conflicted relationship with his son, and said that plaintiff "tend[ed] to act up when he did not get his way." [AR 335].

The ALJ reasonably concluded that the treatment reports did not warrant a finding that plaintiff had a severe mental impairment for any consecutive 12-month period. First, the ALJ rejected Dr. Devera's January 2010 disability opinion on the ground that it was a "check marked form" that contained no supporting findings and was not prepared using social security disability guidelines. See Batson v. Comm'r

of Social Sec. Admin., 359 F.3d 1190, 1195 & n.3 (9th Cir. 2004) (upholding the ALJ's rejection of an opinion that was "conclusionary in the form of a check-list" and lacked supporting clinical findings).  Even if Dr. Devera's January 2010 statement is accepted at face value, it does not establish that plaintiff was disabled for a consecutive 12-month period.

Second, plaintiff's diagnoses of schizoaffective disorder and a history of polysubstance abuse are not sufficient to demonstrate that he had a severe mental impairment during any consecutive 12-month period.  See Sample v. Schweiker, 694 F.2d 639, 642-643 (9th Cir. 1982) (noting that the existence of a diagnosed emotional disorder "is not per se disabling," and that "there must be proof of the impairment's disabling severity").

Third, the ALJ justifiably concluded that certain aspects of plaintiff' treatment history were suspect. [AR 243].  Plaintiff first sought psychiatric treatment shortly before the disability cessation hearing on October 21, 2009.  He began roughly monthly visits to County Behavioral Health.  Plaintiff filed an application for adult SSI benefits during this period, in December 2009. [See AR 274-277, 306].  His last documented visit to County Behavioral Health was March 19, 2010.  In April 2010, plaintiff's application for SSI benefits was granted, and he began receiving benefits. [AR 237, 243, 306-320]. Other than a prescription refill order in June 2010, there is no record that plaintiff sought or received mental health treatment for approximately 15 months after his SSI benefits application was granted.

On June 3, 2011, the ALJ issued a "Notice of Hearing" advising plaintiff that an administrative hearing would be held on August 17, 2011. [AR 243, 263-266].  On June 27, 2011, plaintiff's father or another family member called the police to report that plaintiff exhibited a "blank look" and had threatened plaintiff's father, which led to plaintiff's psychiatric evaluation and hospitalization.

The timing and duration of plaintiff's treatment, and the gaps in his treatment history (between April 2008 and September 2009 and between March 2010 and July 2011) are relevant to assessing the alleged severity of his mental impairment. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (explaining that an "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" can "cast doubt on the sincerity of" a claimant's subjective symptoms); Phillips v. Massanari, 2001 WL 936120, at *6, *9 (N.D. Ill. Aug. 16, 2001) (noting that where the claimant resumed treatment

three weeks before the hearing after an 11-month gap, the ALJ concluded that "the timing of this effort" was "suspicious," and holding that "the ALJ could reasonably infer from the timing of" the claimant's return to treatment that his subjective complaints were exaggerated because he had been able to tolerate his symptoms without medical intervention for a significant period); Nitz v. Massanari, 2001 WL 929759, at *10 (N.D. Ill. Aug. 15, 2001) (holding that "the timing of [the claimant's] first complaint about headaches" one month after the claimant filed his application was "suspicious" and supported the ALJ's adverse credibility finding); Trejo v. Barnhart, 2004 WL 2595939, at *3 (W.D. Tex. Nov. 9, 2004) (holding that the ALJ properly relied in part on the claimant's "inconsistent and suspiciously-timed complaints of depression" to find that he did not have a severe mental impairment for a consecutive period of 12 months).

Fourth, the ALJ found it significant that plaintiff's father told a hospital doctor that he did not deem his son's threats credible, that his son tended to "act up when he did not get his way," and that he was "eager to take [plaintiff] home to take care of some financial problems" related to an internet scam and to "prepare for [his] SSI appeal." [AR 243, 335] The ALJ was entitled to use "ordinary techniques of credibility evaluation" to conclude that, in the context of the record as a whole, plaintiff's hospital records did not warrant a finding that his mental impairment was severe for any consecutive 12-month period. Smolen, 80 F.3d at 1284.

Finally, the ALJ did not err in giving little weight to the GAF scores in plaintiff's hospital records, both because he properly weighed the medical evidence as a whole, and because failure to discuss or adopt GAF scores is not legal error. See Howard v. Comm'r of Social Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."); Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (August 21, 2000) (explaining that the Commissioner has not endorsed the use of the GAF scale in determining disability, and that the GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings").

///

///

///

1

**Conclusion**

2
     The Commissioner's decision is supported by substantial evidence and is free of legal error.

3
Accordingly, the Commissioner's decision is affirmed.

4
**IT IS SO ORDERED.**

5

6
October 31, 2012

7
_____

8
ANDREW J. WISTRICH
United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28